## STATE v KOTOWICZ

Ohio Appeals, 6th Dist, Lucas Co

Decided Feb 23, 1937

Thomas J. O'Connor, prosecuting attorney, Toledo, for appellee.

Eldon H. Young, Toledo, for appellant.

## OPINION

By OVERMYER, J.

In December, 1936, Steve Kotowicz, appellant, was tried to a jury in Common Pleas Court under an indictment charging murder in the first degree while attempting to perpetrate a robbery in and upon one Clement L. Mikolajczyk. The trial resulted in a conviction of Kotowicz of murder in the first degree without a recommendation of mercy, and in due course he was duly sentenced and is now awaiting execution.

Kotowicz appeals to this court from the judgment on questions of law, and the specifications of error urged are, that the trial court erred in the admission of evidence in respect to an alleged dying declaration, and evidence touching other and previous offenses; that the court erred in not charging the jury on the lesser degrees of homicide; and that the verdict is not sustained by the evidence.

Kotowicz did not choose to take the stand and testify and therefore the following facts appear practically uncontradicted in the record, except as they are denied by his plea of not guilty:

On September 19, 1936, Clement L. Mikolajczyk and his wife were operating a grocery store at the corner of Lagrange and Weber streets in the city of Toledo, and about three o'clock in the afternoon they were alone in the store, Mikolajczyk standing behind the counter leaning forward with his arms on the counter working on his accounts, and his wife in front of the counter also leaning down watching his work. Some one entered the store by the front door which was standing open, but the screen door was closed. The wife thought it was a customer and did not look up until the person entering had approached near to her and she turned her head and heard the person say "back up," and she saw a gun in the man's hand and she stepped back, whereupon the man turned to Mr. Mikolajczyk and said either "back up" or "hands up." The wife

glanced at her husband and he had his right hand, which had been on the counter in the act of writing, about "half-way up," and at that instant a shot was fired by the man in front of the counter into the right upper abdomen of Mikolajczyk, standing behind the counter, the bullet, from a 45-caliber Colt automatic, grazing his right forearm on its way and passing through the abdomen and later dropping out of the back near the spine on the stretcher at the hospital.

Mikolajczyk began to back down the aisle behind the counter toward the cash register, saying to his wife he had been shot and asking for a doctor. She moved toward him to catch him if he should fall, and the gunman moved to the front door with the gun still in his hand and stood between the screen and glass doors and in a moment he turned and ran from the store. Mikolajczyk was then standing near the cash register and the wife ran from the store and summoned help and a doctor. In her testimony she gave a general description of the gunman's appearance and dress, which description was later fully corroborated by a number of witnesses who saw Kotowicz enter the store and leave the store and run down the street to an alley and run down the alley. Neither Mikolajczyk nor his wife had theretofore known Kotowicz, but in the record the identity of Kotowicz as the gunman is so clearly established as to leave no room for any doubt.

Mikolajczyk was taken to a hospital and while in the receiving room on a wheel table a city detective and several policemen called to talk to him. As the officers approached the wheel table, Mikolajczyk addressed one of the officers whom he knew and said: "Hello, Bert, well, they got me right this time!" It is this statement which, together with his description of his assailant, his clothing, gun, etc., was offered and received as a dying declaration and the competency of which is challenged. Mikolajczyk was operated upon shortly thereafter, a kidney which the bullet had separated from its appendages was removed, sections of perforated bowels removed and other very serious injuries treated. Up to the time of the operation he was fully conscious but in great pain and shock, and he died the next day.

After the shooting, Kotowicz ran down the street from the store, turned into a series of alleys and went through the rear door into the home of a cousin living not far from the scene of the shooting. He remained there during the remainder of the afternoon and his wearing apparel and talk, actions and conduct were fully and frankly testified to by the cousin and her husband at the trial, and, standing uncontradicted in the record, presents most convincing evidence of the guilt of the accused. During the afternoon two young men friends of Kotowicz came to this home to see him and at once one of the young men said: "Did you have to shoot so high, Steve; could not you aim at his legs?" and Kotowicz answered: "I couldn't help it, the counter was in the way." A few days later Kotowicz was arrested in his room at a cheap hotel in Toledo where he was living under an assumed name. A 45-caliber Colt automatic pistol was found by the police hidden behind a dresser drawer in the room occupied by Kotowicz, wrapped in a handkerchief which Kotowicz later admitted was his. Experts testified that the bullet which killed Mikolajczyk was fired from his pistol.

It is argued that there is no evidence to show that the accused intended to commit a robbery when he entered the store. A young man who had known Kotowicz ten years testified that between 2 and 3 o'clock on the afternoon of the shooting, he talked with him at the corner of Weber and Lagrange streets, diagonally across the intersection from the Mikolajczyk grocery, and asked the accused to buy him a drink and the accused said that "he was broke but that he would have some money after a while." Before the witness left the intersection and within less than a half hour after the conversation, the shooting occurred. When the gunman pointed his pistol at Mikalajczyk, he said either "back up" or "hands up." In the position in which Mikolajczyk was standing, the order "back up" would have taken him in the direction of the cash register, and he moved in that direction after he was shot. If the order was "hands up" it was an order which has a universally known meaning in criminal parlance and justifies the inference of contemplated robbery. The evidence shows that the parties did not know one another prior to the shooting, which practically eliminates any motive such as revenge, hatred, punishment, passion or prejudice, and leaves a natural inference, considered with the statement made shortly before that he would soon have some money, that he entered the store to rob. Inferences may be drawn by the jury from proven facts. The order "hands up" is not given by one about to

shoot a man for revenge, hatred or ill will. The verdict is not against the weight of the evidence on the question of intent.

As to the competency of the dying declaration admitted, there can be no dispute touching the legal requirements to make a dying declaration competent as evidence in Ohio. The rule announced by the Supreme Court in **Robbins v State, 8 Oh St 131,** and followed and even strengthened in all later decisions in Ohio, requires that it must be shown by preliminary evidence not only that they were made in articulo mortis, but also undea a sense of impending death, which excluded from the mind of the dying person all hope or expectation of recovery. However, as stated in 3 Wigmore on Evidence (2 Ed.), 172, Section 1441:

"There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered, though the period of survival outruns expectations."

In **Carver v United States, 160 U. S., 553,** 40 L. Ed. 532, 16 S. Ct. 388, the court say:
"Despair of recovery may indeed be gathered from the circumstances, if the facts support the inference."

Of all the quoted dying declarations reported in our various legal publications and reported cases, no two are exactly alike. This is natural. The difficulty always comes of course, in determining whether what was said, the words used by the declarant, are in fact a dying declaration under the rules governing their admissibility as competent evidence. One declarant might say: "Well, I am shot and I'm going to die"; another, of a different temperament, nationality, educational qualifications and manner of speech, might say: "Well, they got me right this time." These words were spoken by the deceased within a half hour after the shooting, he having repeatedly called to his wife to get a doctor while he was still at the store, and the words were spoken while in the receiving room at the hospital and ready to be taken to the operating room, and the nurses had told the officers that their interview would have to be "very short." His outer clothing had been removed; he was bleeding profusely; the doctor testified that at that time his condition was very grave; he was ashen-gray in color, very cold, pulse weak, with a 45-caliber bullet hole through his right upper abdomen; the bullet had penetrated the large bowel twice and sev-

ered the blood supply to the right kidney, which later was removed, and caffein had been administered to stimulate his heart. The dying man also gave the officers a brief general description of the gunman, and stated he had a 45-caliber automatic pistol, and his statement that they had "got him right" is the qualifying statement that makes his description of his assailant competent evidence.

In 3 Wigmore on Evidence (2d Ed.), 172, Section 1442, it is said:
"In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances. * * * No rule can be here laid down. The circumstances of each case will show whether the requisite consciousness existed."

The question as to what declarant meant by his words is a question of fact to be determined by the jury from all the circumstances, the nature and extent of the injury, the appearance and condition of the dying person, and all the facts and circumstances shown and the reasonable inferences to be drawn therefrom.

In 1 Ruling Case Law 545, it is said:
"* * * it is not necessary that he (the deceased) express, in so many words, his apprehension of impending death, in order to render his statements admissible as dying declarations. It is enough, if it satisfactorily appears, in any mode, that they are made under that sanction, whether it be directly proved, by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to in order to ascertain the state of his mind."

Our attention is directed to a case where the qualifying declaration considered comes as close to being a duplicate of the declaration before us as might be found. In Marshall v Alabama, 218 Ala., 83, 121 So., 72, the qualifying declaration considered was, "she has got me." The declaration was received in evidence and the Supreme Court of Alabama said on review:

"The words, 'she has got me,' in common parlance, may be reasonably interpreted to be the equivalent of the words, 'she has killed me.'"

We find no error in the admission in evidence of the declaration of Mikolajczyk, "Well, they got me right █ this time," and his description of the assailant as a dying declaration. The guilt of the accused is proven beyond doubt in the record, even though the declaration had been excluded, especially when it is remembered that not a word of all the incriminating evidence produced against him on trial is denied by him.

Another question remaining is the complaint that the trial court refused appellant's requests to charge the jury on the lesser degrees of homicide, charging only on murder in the first degree or acquittal.

In the recent case of Malone v State, 130 Oh St, 443, 200 N. E.. 473, the Supreme Court states:

"Where one is indicted and tried for murder in the attempted perpetration of robbery under §12400, GC, no instruction on any lesser degree of homicide than murder in the first degree is requisite or proper when evidence to support the same is lacking."

Finding in the case before us, as we do, that the jury was justified in finding that there was an intent to rob on the occasion in question, there are no other circumstances shown in the record that furnish any evidence to support a verdict of murder in the second degree, or manslaughter.

On trial the state offered several witnesses who were examined in a preliminary way with the apparent intention of showing the commission of other crimes by the accused. Objection being made in each instance by defendant, the state was not permitted to go further than identification of the witnesses and other prelim-. inary and qualifying questions and answers, and we find no error in this respect.

We find no error in the record prejudicial to the rights of the defendant and find that he had a fair trial. The █ fact that the evidence shows a particularly brutal and cold-blooded murder has not led the court to any hasty conclusions, but, on the contrary, because of the statute involved which prescribe. the most severe penalty the law may inflict, we have examined with care the evidence upon which the jury based its verdict, and the matters of which the accused complains, and we find that the rights of the accused were fully safeguarded in his trial and that he must suffer the.

consequences of his voluntary misdeed, however calamitous they may be to him.
Judgment affirmed.

LLOYD and CARPENTER, JJ, concur.