[Cite as *State v. Dillard*, 2012-Ohio-2716.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 09 CO 28 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ERIC DILLARD | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
Common Pleas of Columbiana County,
Ohio
Case No. 2008 CR 115

JUDGMENT:                                        Affirmed.

APPEARANCES:

For Plaintiff-Appellee:                        Atty. Robert Herron
Columbiana County Prosecutor
Atty. Ryan P. Weikart
Assistant Prosecuting Attorney
105 South Market Street
Lisbon, Ohio  44432

For Defendant-Appellant:                   Atty. Joseph A. Mamone
75 Public Square, #1100
Cleveland, Ohio  44113

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  June 11, 2012

WAITE, P.J.

{¶1} In the late evening of April 28, 2008 Appellant Eric Dillard shot Jamie Farley twice in the chest. Two bullets left Appellant's gun and a third jammed when he pulled the trigger. At the time of the shooting, Appellant was prohibited from possessing or using a firearm due to a prior felony conviction. Appellant was then indicted on two counts: murder with a firearm specification and possession of a weapon while under a disability. He was convicted on both counts at the conclusion of a three day trial. On appeal, Appellant challenges the sufficiency and the weight of the evidence against him while also asserting that he established the elements of self-defense by a preponderance of the evidence. Appellant's choice of defense defeats both his sufficiency and weight arguments because he must concede the elements of the crimes. Appellant's conviction was supported by probative evidence on all elements of the offenses charged. Although Appellant sought to support his defense by suggesting the existence of a second firearm used by the victim, despite repeated searches of the crime scene and the dredging of a lake, no evidence of any other firearm at the scene emerged. Appellant's four assignments of error challenging the court's decision as to certain evidence and the weight of the evidence, the performance of trial counsel, and the trial court's decision not to grant a new trial, are equally without merit. The judgment of the trial court is affirmed.

<u>Statement of Fact</u>

{¶2} In May of 2000, Appellant pled guilty to preparation of a controlled substance for sale, a felony. He entered a community intervention in lieu of conviction program and was given conditional release. Appellant subsequently

tested positive for cocaine during a random drug test, a violation of the terms of the diversion program. Due to this violation, his felony plea was reinstated, resulting in probation which was terminated in 2003 without further violation. Under R.C. 2923.13(A)(3), because Appellant pleaded guilty to a drug related felony charge he is prohibited from knowingly acquiring, having, carrying or using any firearm or dangerous ordnance. R.C. 2923.13(A)(3). Appellant does not challenge his conviction on the possession charge, and concedes that he is under this disability in his fourth assignment of error.

{¶3} Appellant's son was born on October 23, 2005. (Tr. Vol. IX, p. 1481.) Appellant admits that when his son was born, he was supporting himself by selling marijuana. Appellant continued to sell marijuana until at least March of 2006. (Tr. Vol. IX, p. 1481.) Appellant testified that around this time he received a phone call from his attorney, who asked him if he wanted to stop selling drugs and suggested that he make a proffer to the Drug Enforcement Administration ("DEA"). (Tr. Vol. IX, pp. 1484-1485.) The record reflects that the actual proffer took place on June 28, 2006. (Tr. Vol. IX, p. 1487; Defense Exhibit AL.) Appellant nevertheless maintains that his motivation to stop selling marijuana was his desire to "be there" for his son. From approximately June of 2006, Appellant began supporting himself by selling clothing, first from a drive-thru in Wellsville, then from his car, and later on eBay and from a storefront in Wellsville. (Tr. Vol. IX, pp. 1488-1489.) To stock his site and store he would buy in bulk, primarily from vendors in New York and Florida.

{¶4} Appellant testified that he was approached by the victim, Jamie Farley, who told him that he was in trouble with the law, might be going to jail, and needed a way to support his children. Appellant had known the victim for most of his life because the victim grew up down the street from him in Wellsville. Later as an adult, the victim lived in the same apartment building as Appellant's girlfriend. The victim told Appellant that he had some money from his recently deceased father's estate and that he wanted to use the money to buy clothing for resale. (Tr. Vol. IX, pp. 1493-1496.) Testimony from Appellant, his girlfriend, and the victim's girlfriend describing the resulting business relationship between the two men differs. Appellant maintains he essentially bought clothing on behalf of the victim, who was himself responsible for marketing and selling, as a one-time favor. Both the victim's girlfriend's testimony and Appellant's subsequent testimony, concerning lump sum payments to the victim, suggest more of an investment or partnership scenario.

{¶5} At some point in late September or early October of 2007, the victim brought an amount from $20,000.00 to $25,000.00, in twenty dollar bills and miscellaneous coins, to Appellant's house, where it was counted and turned over to Appellant. The victim's girlfriend testified that $10,000.00 of the money came from her savings, and that the total was closer to $25,000.00, but also admitted that after counting out the first $20,000.00 she left the house. (Tr. Vol. V, p. 947.) Appellant testified he accepted exactly $20,000.00 and that there was a surplus of a few hundred dollars that the victim retained. Bank records from Appellant's various accounts during this period show two deposits of $4,000.00 made on October 5,

2007 at different times to separate branches of the same bank, and a third deposit of $2350.00 made on October 16, 2007. The balance of the money cannot be accounted for using Appellant's bank statements. Appellant testified that he gave his New York contact the money in cash for additional clothing. (Tr. Vol. IX, pp. 1495-1497; 1512-1513.)

{¶6} When the clothing arrived, Appellant stored it in a storefront he maintained next to the restaurant he and his girlfriend operated. The victim, the victim's girlfriend, and family members all had access to the clothing stored in the building through Appellant. According to Appellant, the victim's family and friends all took clothing, both to sell and for personal use. It does not appear that the victim had his own key or separate means to access the building where the clothing was stored and sold.

{¶7} At some point during October of 2007, Appellant and his girlfriend decided to close the restaurant, which was losing money. (Tr. Vol. IX, p. 1516.) The storefront, where Appellant sold adult materials and shoes in addition to clothing, remained open. On a Sunday in early February of 2008, Appellant and the victim went to the storefront and found that the locks on the doors had been changed by the landlord. (Tr. Vol. IX, p. 1520.) Appellant did not know why he had been locked out. Testimony suggests that the victim was angered by the lockout and that Appellant contacted their mutual attorney to begin legal action to resolve the matter. Appellant was subsequently contacted by a DEA agent who asked him if there were drugs being stored on the premises. Appellant denied this and agreed to a search of the

building. He was then contacted by a Wellsville police officer, who would be conducting the search on behalf of the DEA. As Appellant had given consent to the DEA agent for the search, he was never shown a warrant. Appellant was present when the landlord unlocked the building and the officers conducted the search. During the search nothing was seized. Although Appellant was present, he was not allowed to enter the building.

{¶8} Appellant's efforts to gain access to the storefront continued into March of 2008. Although the various bank statements offered in evidence show either small or negative bank balances for the life of all accounts associated with Appellant and his businesses, Appellant cites the lockout as the origin of his financial problems. (Tr. Vol. IX, pp. 1523-1526; 1528.) Appellant also testified that soon after giving Appellant his "investment," the victim began inquiring about the money and asking Appellant for money. Appellant testified that he "paid back between four and five" or "four thousand and forty-five hundred dollars" of the money he was given before the landlord locked the building. (Tr. Vol. IX, p. 1528.) Although Appellant testified he was having trouble making utility and car payments, at some point in March several weeks after the locks were changed, he made arrangements to purchase a Hummer to replace the Yukon he had been driving. After his purchase of the Hummer, the victim's requests for money intensified, despite Appellant's explanation that the payments on the new car were actually lower, so he was saving money. (Tr. Vol. IX, pp. 1532-1533.)

{¶9} According to Appellant, between March 18, 2008 and April 22, 2008 the victim made verbal threats four or five times. He describes only one specific instance which occurred at a car wash, when the victim said "[o]kay, I believe [that you don't have money], because I'd hate to have to run up in your house when you guys was[sic] asleep, get you late at night." (Tr. Vol. IX, pp. 1533-1535.) Appellant describes the other threats as "[j]ust saying like how he had beat people up, shot at people's houses, and he had killed somebody before and he got away with it." (Tr. Vol. IX, p. 1535.) Appellant also testified that he had seen the victim with a gun on four or five occasions and that the victim told him he always carried a gun "[j]ust for pro- - just that he always had one with him." (Tr. Vol. IX, p. 1537.) Appellant was also aware that the victim had been in "trouble" for "[a]ssaults, criminal damaging, menace and chasing after people, robbery, selling drugs," and that he knew the victim had been to prison for drug trafficking and, as a juvenile, for robbery. (Tr. Vol. IX, pp. 1535; 1536-1537.) There were no other witnesses to the threats, and Appellant did not report them to the police. Appellant admitted that he never actually saw the victim threaten anyone with a gun. He also explained that although he never formally reported the threats to the police, he had mentioned them to an Officer Weekly, who had responded dismissively, saying the victim was not a threat, a point Appellant conceded, saying "[y]eah, I know, but he could maybe pay a crackhead to do it." (Tr. Vol. IX, pp. 1660-1661.)

{¶10} On the evening of April 22, 2008, Appellant's girlfriend spoke with the new tenant of the restaurant that shared the building where the clothing was stored.

She believed the new tenant was going to open the door for her and Appellant that night to allow them to remove the clothing. In preparation, she drove to West Virginia to borrow a truck from her brother. Later that evening when Appellant was at home with his son he received a phone call from the victim, who called from another person's cell phone, and was "screaming" and saying "[y]ou act'en[sic] like I ain't a man, Dawg? You act'en[sic] like I ain't a man, Dawg." (Tr. Vol. IX, p. 1560.) According to Appellant, the victim continued, "'F' this fed case. I'm doing you in tonight." (Tr. Vol. IX, p. 1561.) Appellant recorded a portion of this call with a recording feature on his phone, however, the recorded portion did not include any raised voices or the above quotes. The recording, which lasts for one minute of the three minute call, was transcribed during the trial as follows: "***(Inaudible) I got my own (inaudible). (Pause.) But that ain't helping me pay my shit. (Pause.) Now, listen, y'all. (Inaudible). (Pause.) (Inaudible). (Pause.) No, I'll just – I'll come there, Dawg. Don't worry (inaudible). (Beep.)" (Tr. Vol. VII, pp. 1147-1148.) The recording was recovered from Appellant's phone by Special Agent Richard Warner and presented by the agent at trial. Appellant testified that by the conclusion of the call, which is not contained in the recording, the victim had reached his house and was calling for Appellant to come outside. Appellant responded by going to his closet, taking out his handgun, which he kept loaded, and carrying the handgun outside with him. Appellant confronted the victim, pointed the gun at him and said "get the 'F' off my property and don't never come back. * * * 'You're not going to be threatening us

down here.' * * * 'You can wait for [our lawyer] to sue the landlord or there's nothing else I can do.'" (Tr. Vol. IX, pp. 1564-1570.)

{¶11} According to Appellant the victim responded "'You "F"-ed up Dawg. How you going to pull a gun on a gangster? How you going to pull a gun on a gangster?' * * * 'I'll be back,' and he got in the car and left." (Tr. Vol. IX, pp. 1571-1572.) At this point, Appellant called his girlfriend to pick up their son and get him out of the house. She arrived, ran into the house looking for the child, and carried him out to the Hummer. She and Appellant both testified that Appellant set his firearm down to help his girlfriend get the child strapped into the vehicle, which was parked partly in the road and partly on the sidewalk in front of the house. As the two finished securing the car seat, the victim returned and approached the vehicle from behind, yelling. The girlfriend testified that she momentarily considered backing over the victim before she drove away, but she was afraid of what might happen to the baby if she tried. Appellant testified that at this point, he chose not to get in the car and flee the scene with his girlfriend and son because he believed that the victim might fire a gun into the car and hit the child. Appellant testified that the victim was coming toward him, yelling, as the Hummer pulled away. Appellant ran to retrieve his gun while the victim was approaching him at an angle. At this point, he could not see both of the victim's hands. Appellant raised his gun and told the victim to get down on the ground. He then fired three times, striking the victim twice before the weapon jammed.

{¶12} According to Appellant, the victim said "[a]h, ah, he shot me" and "took off running;" jumped into the car which pulled toward him, and then drove past. (Tr. Vol. IX, p. 1579.) The victim attempted to shut the car door, but did not have enough strength. The car pulled away and proceeded down the street. When Appellant saw brake lights as the car slowed at an intersection, he tried to clear the chamber of the jammed round and put the clip back in the gun to be prepared to shoot again. (Tr. Vol. IX, p. 1581.) When the car began to turn at the next intersection, the door swung open and the victim fell into the street. Neighbors ran down from their porches and out of their houses, and one of them applied pressure to the victim's chest wounds until the paramedics came. Attempts to stabilize the victim were unsuccessful and his body was turned over to the coroner.

{¶13} Police responded within minutes. Appellant was found in his front yard holding the gun. Appellant testified that when Officer Anderson arrived at the scene he announced to the officer "I think I shot Jamie Farley" to which the officer responded "[d]on't say nothing else, Eric." (Tr. Vol. IX, p. 1586.) Appellant further testified that Officers Anderson and Wilson told him to "shut up" at various points when arresting him, placing him in the car at the scene, and while he was waiting in the car; but that he did not receive a complete *Miranda* warning until he reached the police station. (Tr. Vol. IX, pp. 1592-1594.)

{¶14} Two separate crime scenes were identified, one in front of Appellant's house, and the second at the intersection where the victim fell out of the car. In addition to taping off, photographing and processing both scenes, a grid search of a

nearby vacant lot was conducted. The shell casings were found outside of Appellant's fence. Two bullets were retrieved from the victim's body, two spent shell casings and one live bullet were retrieved at the scene. A fourth live bullet was taken from the chamber at the scene by an officer when he secured the firearm. Appellant admits he did not see the victim with a gun. The victim never fired a shot that night. No gun other than Appellant's was found at the scene and no evidence of the existence of any gun other than Appellant's was found at the scene that night or during subsequent searches.

## Statement of the Case

{¶15} Appellant was indicted by the grand jury on two counts; the first, murder with a firearm specification, the second, having weapons while under disability. Murder is a violation of R.C. 2903.02(A), which provides: "No person shall purposefully case the death of another * * *." The firearm specification refers to the use of the weapon in the commission of murder. Possession of a weapon while under disability is a violation of R.C. 2923.13, which states in part: "Unless relieved from disability * * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse." R.C. 2923.13(A)(3).

{¶16} On May 15, 2009, the jury returned its verdict, finding Appellant guilty of murder, a violation of R.C. 2903.02(A); guilty of a firearm specification, a violation of R.C. 2941.145(A); and guilty of having a weapon while under a disability, a violation

of R.C. 2923.13(A)(3). The court polled the jury sua sponte and each juror confirmed the verdict. The trial court scheduled the sentencing hearing for a later date.

{¶17} Appellant filed a motion for acquittal and/or new trial on May 29, 2009. A hearing on the motion was held June 29, 2009. No additional evidence was presented at this hearing. Subsequently, Appellant presented the affidavits of two witnesses who swore that they saw the victim's girlfriend's mother drop a white plastic bag into Highlandtown Lake. Appellant claimed he had reason to believe a gun was concealed in the bag. The state filed an affidavit from the woman said to have thrown the bag in the lake, who stated that this event never happened. Nevertheless, the court ordered dredging of the lake, but this failed to uncover either a weapon or the bag. Appellant's motion for new trial was ultimately denied on July 1, 2009.

{¶18} Appellant's sentencing hearing was held on August 3, 2009. The court heard statements from the victim's family and from Appellant. The court sentenced Appellant to fifteen years to life on the murder conviction, with an additional three years for the firearms specification, to be served consecutively. On the second count, having a firearm while under a disability, the court regarded what had occurred as the worst form of the offense and sentenced Appellant to five years, the statutory maximum. The court ordered these sentences to be served consecutively, for an aggregate minimum term of twenty-three years, and a maximum term of life in prison.

<u>Argument and Law</u>

<u>First Assignment of Error</u>

APPELLANT'S RIGHTS TO DUE PROCESS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WERE VIOLATED AS THE VERDICT WAS CONTRARY TO LAW.

<u>Second Assignment of Error</u>

APPELLANT'S RIGHT TO DUE PROCESS AND AN IMPARTIAL JURY UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WERE VIOLATED AS THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶19} Appellant's first and second assignments of error are in essence the same argument: that the verdict was against the manifest weight of the evidence because Appellant proved that he was defending himself or others by a preponderance of the evidence. The two assignments are both without merit, however. The state offered probative evidence on each element of the offenses charged and in Appellant's affirmative defense he concedes those elements. Although Appellant sought at trial to suggest a version of events driven by his fear of the victim, this was a credibility determination for the jury. Appellant's credibility on this issue was undermined, however, by the facts in the record: no witness saw the victim with a gun at the scene, no gun was recovered from the scene; and no trace evidence of a second firearm was recovered from the victim's body or from the scene; Appellant had conceded that the victim was harmless and the conversation

that Appellant recorded between himself and the victim included none of the threats described; both Appellant's testimony and the location of the evidence at the scene place the victim on the sidewalk and the street and not on Appellant's property. Nothing identified by Appellant in the record supports a conclusion that the verdict was either contrary to law or against the weight of the evidence.

{¶20} In order to prevail, Appellant had the burden of proof to show that he acted in self-defense by a preponderance of the evidence. R.C. 2901.05. "The proper standard for determining in a criminal case whether a defendant has successfully raised [self-defense] under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue." *State v. Melchior*, 56 Ohio St.2d 15, 381 N.E.2d 195 (1978), paragraph one of the syllabus. Self-defense is an affirmative defense which the code defines as a "defense involving an excuse or justification" and the Supreme Court describes as "'justification[s] for admitted conduct'" which a defendant claims "exempts him from liability even if it is conceded that the facts claimed by the prosecution are true." R.C. 2901.05(D)(1)(b); *State v. Poole*, 33 Ohio St.2d 18, 19, 294 N.E.2d 888 (1973). "[T]his defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986). In the instant matter, Appellant admits to the purposeful killing of Jaime Farley. Appellant claims,

however, that his act was justified by a fear for his life or the lives of others and was therefore excusable.

**{¶21}** While Appellant mentions due process in his first assignment of error, he briefly argues in this assignment that he established the elements necessary to establish that he was acting in self-defense by a preponderance of the evidence, and this is the crux of his argument. In support of this contention, Appellant generally cites to his own testimony concerning his first-hand experiences of the victim and the testimony of other witnesses describing instances of the victim's behavior which were unknown to Appellant at the time of the shooting. He also specifically relies on a photograph of the victim's tattoo, which the court ruled inadmissible at trial, in support of his argument. The tattoo on the victim's chest read "thug life" and was offered by Appellant as evidence of the victim's violent nature. Appellant argues that the court's decision not to admit the photograph of the tattoo was prejudicial because the photograph was the single piece of evidence that would have allowed the jury to reach the correct conclusion that he had acted in self-defense. Appellant specifically relies on this ruling as the single prejudicial error that requires reversal; however he attempts to buttress his argument with the trial court's limiting instructions concerning testimony describing the victim's prior, unrelated, violent behavior, behavior which Appellant was unaware of at the time of the shooting.

**{¶22}** Appellant argues in his second assignment of error that the verdict was against the manifest weight of the evidence. Rather than challenge the state's proof on the elements of the offense, his argument consists of a catalogue of the victim's

alleged violent tendencies. In both assignments of error, Appellant does not argue that the state failed to present sufficient evidence of the elements of the charged offenses. Rather, Appellant advances the theory that his admittedly criminal conduct is excused because he was acting in self-defense, and the evidence in the record supporting his self-defense theory outweighs the evidence against reaching this conclusion. Thus, the two assignments will be considered together.

{¶23} In determining whether a criminal judgment is against the manifest weight of the evidence, this Court acts as a "thirteenth juror" to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). The verdict is not against the weight of the evidence when the record contains evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978).

{¶24} The " '[w]eight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.)" (Internal citations omitted.) *State v.*

*Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, *supra*, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶43.

{¶25} To establish self-defense, a defendant bears the burden of proving the following elements: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the defendant did not violate any duty to retreat or avoid the danger. *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. Specific instances of a victim's conduct are not admissible to prove that the victim was the initial aggressor. *State v. Barnes*, 94 Ohio St.3d 21, 759 N.E.2d 1240 (2002). In reaching this conclusion, the Ohio Supreme Court noted that "[p]roof of a victim's propensity for violence, standing alone, does not prove an element of a claim of self-defense. Proof of a victim's violent character does not show that the victim was the first aggressor in a particular conflict, nor does proof of a victim's passive demeanor foreclose the defendant from asserting a claim of self-defense." *Id.* at 25 quoting *State v. Custodio*, 136 Idaho

197, 30 P.3d 975, 982 (App.2001) as persuasive authority. The Ohio Supreme Court reasoned that, "[a]lthough a victim's violent propensity may be pertinent to proving that he acted in a way such that a defendant's responsive conduct satisfied the elements of self-defense, no element requires proof of the victim's character or character traits. A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character." (Emphasis omitted.) *Barnes* at 24.

{¶26} In the matter at bar, Appellant makes the very mistake identified by the *Barnes* Court. He has confused the possible relevance of the victim's alleged propensity for violence to his affirmative defense with the existence of the defense itself. Appellant's defense devoted significant time to testimony from people who knew the victim and had witnessed violent episodes. While the defense established that the victim had, at various points, been violent to and in front of a variety of people, none of the instances appear to have been known to Appellant prior to April 28, 2008. More importantly, neither this testimony nor the existence of a suggestive tattoo addresses the issue crucial to Appellant's defense: whether actual threatening behavior engaged in by the victim (not simply shouting) was the origin of the shooting, whether Appellant was blameless in creating the situation, and whether Appellant acted in the absence of a duty to retreat.

{¶27} The testimony offered by Appellant and his girlfriend describes verbal threats and shouting on the night of the shooting, although no threats or shouting are included in the portion of the conversation actually taped by Appellant. Appellant testified that he responded to the conversation he taped, which appeared to conclude

with "don't worry," by calling his girlfriend to remove his child from the house, retrieving his loaded gun, confronting the victim with the gun, and ordering him off of the property. Appellant describes helping his girlfriend load their son into their vehicle in front of the house when the victim returned to the scene. Appellant stated he stood on the sidewalk in front of his house, told his girlfriend to leave, turned, and shortly thereafter shot the victim twice in the chest.

{¶28} The locations of the bullet casings and blood stains at the crime scene reflect that two shots occurred outside of Appellant's fenced-in yard, and certainly outside of the house. Nothing found at the crime scene, or in subsequent searches, would indicate that the victim had a gun or other weapon that night. Under these circumstances it is entirely reasonable for the jury to conclude from the information before it that Appellant was not acting in self-defense. While Appellant testified that he believed he was in imminent danger, his testimony and the testimony of others also shows that rather than calling the police or letting his dogs out into the yard and remaining inside, he choose to arm himself, leave the house, point a gun at the victim and then shoot the unarmed victim in the street.

{¶29} The fact that Appellant's defense included testimony concerning acts of violence allegedly perpetrated by the victim and the fact that the victim had a suggestive tattoo in no way discharged Appellant's burden to establish the three elements of his affirmative defense: the absence of fault, a bona fide belief of inherent danger and the absence of a duty to retreat. *Robbins, supra*, at paragraph two of the syllabus. Whether or not the victim had a gangland-style tattoo was in no

way probative of the victim's conduct on the night in question. The trial court's decision to exclude evidence of this tattoo was within the court's discretion. *Barnes*, *supra*, p. 25. Appellant has conceded the elements of the underlying crimes. He bore the burden of proving his self-defense claim. This defense hinges, in large part, on his credibility. The record is clear, however, that the victim was not seen with a weapon at the time he was shot, most tellingly, not even by Appellant. The record of the events of April 22, 2008, at the very least, does not reflect that Appellant was blameless in creating the circumstances or that he acted in the absence of a duty to retreat. Appellant's first and second assignments of error are without merit and are therefore overruled.

Third Assignment of Error

APPELLANT WAS DENIED HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL FAILED TO PROTECT HIS RIGHTS DURING TRIAL.

**{¶30}** Appellant identifies five alleged errors made by trial counsel and argues that each rises to the level of ineffective assistance of counsel. Appellant believes trial counsel should have: (1) sought a change of venue for trial; (2) prevented him from testifying; (3) sought to suppress all statements made by Appellant; (4) moved to exclude the victim's dying declaration, and (5) forced an additional witness to testify. Appellant fails to demonstrate that trial counsel's performance was deficient

in any way and further fails to demonstrate prejudice as a result of these alleged errors.

**{¶31}** To prevail on a claim of ineffective assistance of counsel, Appellant must show not only that counsel's performance was deficient, but also that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984) *see also State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶107. "Deficient performance" means performance falling below an objective standard of reasonable representation. "Prejudice," in this context, is defined as a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland* at 687-688, 694. Moreover, in evaluating the performance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691. Each of the errors alleged here will be evaluated under the two pronged *Strickland* test, in addition to any applicable individual standard.

**{¶32}** Appellant challenges trial counsel's decision not to seek a change of venue. Appellant argues that he was known in the community for his drug-related activities and refers to some publicity concerning the shooting in support of this contention. Appellant does not specifically identify the information driving this argument or its source, nor does he identify any comment or action by the jurors

tending to demonstrate bias or improper influence due to this publicity. Criminal Rule 18(B) does not require a change of venue due to the mere existence of pretrial publicity, even extensive pretrial publicity. *State v. Landrum*, 53 Ohio St.3d 107, 116-117, 559 N.E.2d 710, 722-723 (1990). Any decision on a change of venue rests in the sound discretion of the trial court. *Id.* at 116. " '[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " Id. at 117, quoting *State v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035, 1051 (1976), vacated on other grounds, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1155 (1978). A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *Mayola v. Alabama*, 623 F.2d 992, 996 (5th Cir.1980). Only in rare cases may prejudice be presumed. *Id.* at 997; *accord Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554-555, 96 S.Ct. 2791, 2800-2801, 49 L.Ed.2d 683, 694-695 (1976). Even extensive pretrial publicity does not require a change of venue where none of the jurors indicate they would have trouble putting it out of mind. *Landrum*, 117.

{¶33} Although the record reflects that the shooting did receive some publicity, Appellant produced nothing to suggest that the publicity influenced the jury in any way. The majority of the jurors indicated that they did not know Appellant or the victim and were at most only peripherally aware of any publicity. The two potential jurors who were familiar with Appellant were excused. The record reflects extensive questioning by counsel concerning publicity and the ability of the jurors to reach independent conclusions on each element of the crimes charged. The juror's

responses reflect ignorance of Appellant's alleged reputation and ignorance of the shooting. Nothing in these responses suggests that the jury selected was in any way less objective than a jury empanelled in a different jurisdiction would have been. The fact that there may have been some publicity about the shooting or Appellant's past criminal activities is irrelevant when all but two potential jurors (who were dismissed) were ignorant of this information. Nothing in the record suggests trial counsel was deficient in not requesting a change of venue or that a change would have been merited had one been requested.

**{¶34}** Appellant next maintains that trial counsel should have prevented him from testifying on his own behalf during trial. This record reflects that Appellant was informed by the court that he was not obligated to testify. He was fully informed of his rights, asked whether he had discussed the decision with counsel, and he was offered additional time to again discuss his decision with counsel. Appellant indicated that he understood the ramifications of his decision, and that he nevertheless wished to testify. (Tr. Vol. VIII, pp. 1342-1344.) As the state points out, Appellant's chose to maintain a theory of self-defense, not innocence. He was thus required to prove not only his reasonable fear of the victim, but also that he was not at fault in creating the situation and did not violate any duty to retreat. Under the circumstances, it is difficult to understand how Appellant could satisfy the requirements of his own defense without taking the stand. Appellant's suggestion that all of the material covered by his testimony could have been "adduced through other means" strains credulity in the context of his affirmative defense. (Appellant's

Brf., p. 26.) Appellant's assertion that counsel should have forced him not to testify under these circumstances is equally incongruous. It is unclear what means Appellant now believes counsel should have employed to force him to invoke his Fifth Amendment rights and give up his right to testify. Neither a decision to testify or to remain silent can be compelled. Appellant made his decision to take the stand on his own behalf after being fully informed of its potential consequences, and trial counsel was not deficient in agreeing with Appellant's decision.

{¶35} Appellant next argues that, although he was told by various officers at the scene to remain silent, because he was not read his *Miranda* rights in their entirety until he reached the police station where he signed a *Miranda* acknowledgment and was allowed to see counsel after he signed the acknowledgement, his warning was somehow defective. (Tr. Vol. IX, pp. 1644-1648.) He claims that his rambling, one-sided discussion of the night's events which were recorded in the cruiser as he was being transported to the police station should have been suppressed. He also argues that the search of his house, conducted after Appellant consulted with two attorneys at the police station and signed a consent form allowing this search, should not have been conducted without a warrant. Appellant's own testimony, however, establishes that he was told repeatedly to stop talking both before and after being placed in the cruiser and Appellant does not dispute the fact that his various statements were voluntary and not in response to questioning. Appellant also does not dispute that he consented to a search of his property.

**{¶36}** As the Ohio Supreme Court explained in *State v. Tucker*, 81 Ohio St.3d 431, 692 N.E.2d 171 (1998), and in accord with *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), "the *Miranda* rules do not operate to prevent the use as evidence of every statement made by a person in custody: 'Confessions remain a proper force in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege [against compulsory self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.'" (Emphasis deleted.) *Tucker* at 436, quoting *Innis* at 299-300. Where, as here, a defendant makes voluntary, unprovoked statements to the police, even while under arrest and being transported to jail, those "statements * * * do not fall under the *Miranda* protections." *State v. Dumas*, 7th Dist. No. 06 MA 36, 2008-Ohio-872, ¶18. "The *Miranda* requirements do not affect the admission of volunteered statements made without police coercion or inducement." *Id*.

**{¶37}** The fact that Appellant's statements in the cruiser were recorded does not alter the *Miranda* analysis. Various Ohio courts have held that there is no expectation of privacy in the back of a police cruiser, and have declined to exclude a variety of communications recorded in the back of a cruiser without the knowledge of one or all individuals involved. *State v. Ingram*, 9th Dist. No. 10CA0022-M, 2010-Ohio-3546, ¶15-17 (appellant had no reasonable expectation in his cell phone conversation with his mother which was recorded while he was seated in the back

seat of the police cruiser prior to formal arrest) *accord State v. Blackwell*, 8th Dist. No. 87278, 2006-Ohio-4890, ¶33-35 (appellant had no reasonable expectation of privacy in his unwittingly tape-recorded conversation in the back of a police cruiser with two co-defendants regardless of the fact that one co-defendant then turned state's evidence) *accord State v. Skidmore*, 12th Dist. No. CA99-12-137, 2000 WL 1086722 (August 7, 2000) (where appellant, who had been arrested but not read his rights, and did not know he was being recorded, made spontaneous statements while in the back of the police cruiser the reviewing court found that there was no *Miranda* violation, appellant had no expectation of privacy in the cruiser, and trial counsel was not ineffective for not having sought to suppress the recording). Here, Appellant's voluntary, unprovoked statements in the cruiser were not *Miranda* violations and in no way pollute the information and waivers obtained after he was read his *Miranda* rights, signed his acknowledgement, met with counsel, and signed the consent to search waiver. Appellant presents no valid reason why trial counsel should have moved to suppress the recording, nor does he offer any argument in support of his conclusion that the search to which he consented should, instead, have been conducted pursuant to a warrant. Nothing in the record or under applicable law suggests a motion to suppress was merited or that, if filed, such a motion would have been granted. Accordingly, Appellant has failed to demonstrate that counsel's decision not to seek the suppression of his voluntary statements and the consent to search was deficient and has failed to demonstrate any resulting prejudice.

**{¶38}** Appellant also claims that statements made by the victim to Officer Eisenhart while he was lying in the street waiting for an ambulance after the shooting should have been excluded as hearsay. As we have summarized in *State v. Ross*, 7th Dist. Nos. 96 C.A. 247, 96 C.A. 251 (October 12, 1999) and in *State v. McGee*, 7th Dist. No. 07 MA 137, 2009-Ohio-6397, ¶33: "In order for statements of a deceased to be admissible as dying declarations, '[i]t is essential * * * that it should be made to appear to the court, by preliminary evidence, not only that they were made in articulo mortis [at the point of death], but also made under a sense of impending death, which excluded from the mind of the dying person all hope or expectation of recovery.' * * * *Robbins v. State* (1857), 8 Ohio St. 131. The state of mind of the declarant at the time of his declarations is decisive. *State v. Woods* (1972), 47 Ohio App.2d 144, 147, 352 N.E.2d 598. 'Despair of recovery may * * * be gathered from the circumstances if the facts support the inference.' *State v. Kotowicz* (1937), 55 Ohio App. 497, 501, 9 N.E.2d 1003, quoting *Shepard v. United States* (1933), 290 U.S. 96, 100, 54 S.Ct. 22, 78 L.Ed. 196." The United States Supreme Court noted in *Shepard*, "[t]here is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered, though the period of survival outruns the bounds of expectation." *Id.* at 100.

**{¶39}** The record in this instance reflects that the victim was shot, retreated to the car in pain, and struggled to get in. When the car began to turn, the victim's door swung open and he fell out into the street, where he was unable to move. He told his girlfriend repeatedly, "[b]aby, I'm dying." (Tr. Vol. V, pp. 977-980.) When a witness

arrived to help, the victim said "[m]an, I think I'm going to die." (Tr. Vol. III, p. 546.) When Officer Eisenhart arrived, the victim told her he could not breathe and that he had been shot by Appellant. (Tr. Vol. III, p. 440.) The timeline in the record shows that all of this occurred in the space of a few minutes. It is not necessary that the decedent utter the precise words "I believe I am dying" or "this is my dying declaration," however, here the record clearly shows that the victim said precisely these words. Where the victim is shot twice in the chest, is bleeding from both wounds, is unable to lift himself or help others to do so and as a result lays in the middle of the street struggling to breathe, having told those around him he believes he is going to die, the trial court's decision to admit his statement to the responding officer is plainly reasonable. In fact, this scenario appears to present a textbook example of a dying declaration.

**{¶40}** Finally, Appellant alleges error as a result of the decision not to subpoena Attorney Christopher D'Amato as a defense witness. In general, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). It appears from the record that Atty. D'Amato had been engaged by both the victim and Appellant in connection with their business venture. After the shooting, he was barred from representing Appellant due to his professional relationship with the victim, although he was apparently present when Appellant was taken to the police station following the shooting. Appellant believes that Atty. D'Amato should have been called to testify as to the victim's reputation for

violence. However, nothing in the record or advanced by Appellant on appeal suggests that the attorney, who was not present at the scene of the crime, could have offered relevant testimony. It is equally possible, inasmuch as Atty. D'Amato was privy to unsavory information regarding Appellant, as well, that any testimony he could give would be harmful to the defense. There is no reason to second-guess trial counsel's decision not to call Atty. D'Amato.

**{¶41}** Again, in order to reverse a trial verdict on a claim of ineffective assistance of counsel, Appellant must demonstrate not only that counsel's performance was deficient, he must also show prejudice resulting from the deficiency. "To establish prejudice, 'the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶108. Appellant in this instance failed on both elements. He has not demonstrated that any of the decisions he identifies were deficient, and has further failed to connect the alleged errors to any reasonable probability that had counsel acted otherwise, the result of the trial would have been different. Appellant's third assignment of error is overruled.

Fourth Assignment of Error

APPELLANT'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WAS VIOLATED WHEN THE TRIAL COURT DENIED APPELLANT'S MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.

**{¶42}** In Appellant's fourth assignment of error he alleges the existence of newly discovered evidence. In support of this argument, Appellant cites the trial testimony of a bystander, Edwin Mercer, concerning a diaper bag allegedly located at the scene and refers to affidavits concerning the alleged disposal of a white plastic bag in Highlandtown Lake. Although one witness, Mr. Mercer, recalls seeing a light blue diaper bag on the back seat of the victim's car, the police inventory of the vehicle reflects no such bag in the car, and instead notes a car seat in the back seat and a purse on the floor in the same area. Appellant suggests that there may have been a diaper bag in the victim's car and that the victim's gun was removed from the scene in that diaper bag before being thrown in the lake by the victim's girlfriend's mother. On the night of the murder, the car was inventoried and the police conducted a grid search of the alley and of an adjacent empty field. The police returned a few days later, on a tip from Appellant's girlfriend, to re-examine the gutter in the alley. None of these searches resulted in any evidence that there was a second firearm involved in the shooting. Although the victim's hands were not bagged at the scene due to ongoing efforts to medically stabilize him, none of the surviving trace evidence supports the conclusion that he had a gun. Although one witness believes he saw a diaper bag, no witness, not even Appellant, testified that the victim also possessed a gun that night or that it was a gun that was allegedly thrown into the lake after the shooting. Under the circumstances, it appears plausible that what the witness identified as a diaper bag in the back seat of the victim's car

was in fact what the inventory lists as a purse. In any event, not one witness to this shooting saw a gun other than the one Appellant used to kill the victim.

{¶43} In her testimony, the victim's girlfriend's stated that the victim threw his empty hands up in a questioning manner and Appellant then shot him twice. (Tr. Vol. V, p. 969.) She testified that at the time of the shooting the victim no longer owned a handgun, and that they sold his 9 mm and her .20 or .22 gauge shotgun to her brother in 2006 or 2007, at least a year prior to this shooting. (Tr. Vol. V, pp. 973-976.) Her siblings confirmed that they purchased firearms from the victim but they also testified that he may have had guns in addition to the two identified by their sister.

{¶44} After trial, Appellant produced two affidavits in which the affiants described seeing the victim's girlfriend's mother stop her car on a bridge over Highlandtown Lake and drop a white plastic bag into the lake. Neither affiant saw a gun; only the bag. The two affiants state that they were in a boat fishing on the lake at the time. According to the state, neither affiant has ever held a fishing license. In response to the two affidavits produced by Appellant, the state filed a sworn statement from the victim's girlfriend's mother who attested that this act never occurred. The trial court nevertheless ordered dredging at the state's expense. No bag, gun, or other evidence was recovered.

{¶45} In short, there was no new evidence for the court to consider. The testimony about a diaper bag, the firearm tip, lack of trace evidence and second search of the property was in front of the jury during the deliberations that resulted in

the guilty verdict, and is not new information. The court fully investigated the post-trial allegations concerning the plastic bag and produced no further evidence. In the absence of any new evidence supporting the motion for new trial, the trial court's ruling was proper. Appellant's fourth assignment of error is overruled in its entirety.

## Conclusion

**{¶46}** Appellant's conviction was supported by probative evidence as to all elements of the offenses charged and was not against the weight of the evidence. Trial counsel performed appropriately and made reasonable tactical decisions. There was no evidence of prejudice to the defendant resulting from the decisions of trial counsel. Although the trial court fully investigated Appellant's claims concerning new evidence, no actual new evidence was produced by Appellant. Accordingly, Appellant's four assignments of error are without merit and are overruled. The judgment of the trial court is affirmed in full.

Donofrio, J., concurs.

DeGenaro, J., concurs.