[Cite as *State v. Kennedy*, 2013-Ohio-4221.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-120337 |
| | | TRIAL NO. B-1104558 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| KENNETH KENNEDY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  September 27, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro,* for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1}     Defendant-appellant Kenneth Kennedy appeals from the judgment of the Hamilton County Court of Common Pleas convicting him of multiple offenses in relation to two separate incidents that occurred between March and June 2006 in Cincinnati.    He now appeals, claiming errors in (1) the failure to sever the offenses, (2) the admission of hearsay evidence, (3) the admission of other-acts evidence, (4) the sufficiency and the manifest weight of the evidence, and (5) the imposition of sentence, including the court's failure to merge offenses, to make the statutorily-required findings before imposing consecutive sentences, and to notify of postrelease control.

{¶2}     Because the trial court imposed consecutive sentences for all offenses without making the statutorily-required findings and failed to notify Kennedy of his postrelease-control requirements with respect to some of the offenses, we must vacate the sentences and remand the case for resentencing, at which time the court can provide Kennedy with the necessary postrelease-control notifications.  We affirm the trial court's judgment in all other respects.

## I. Background Facts

### A.  Gambling-Apartment Shootings

{¶3}     In the early morning of March 27, 2006, Janie Matthews, known as "Bedrock," Rodney Turnbow, Derrick Dumas, and others were playing cards for money in Matthews's second-floor apartment in the Walnut Hills area of Cincinnati. According to Dumas, Jaydee Thompson had participated in the game earlier in the night.

{¶4}     About 30 minutes after Thompson left, at least two armed and masked male assailants entered Matthews's apartment building.   One of the assailants knocked on Matthews's door.  After Matthews had partially opened the door, he shot her with a 9-mm semiautomatic weapon and forced his way in.  He

2

then fired at Turnbow with the same gun, striking him in the head, and robbed everyone inside the apartment, including Dumas.

{¶5}     Later, as the assailants fled down the stairs of the apartment building, they encountered Deandre Thomas.  Thomas recognized Thompson as one of the assailants, and Thompson shot Thomas in the face.

{¶6}     When the police arrived, they found Matthews just inside the apartment, near the door, and Turnbow nearby.  Both died as a result of their gunshot wounds.  The police found Thomas on stairs of the apartment building.  He survived and identified Thompson as the man who had shot him.  Ballistic-test results on the cartridges that the police found at the crime scene demonstrated that two firearms had been used.  The cartridges found inside Matthews's apartment and just outside of her door had been fired from one firearm, but the cartridges found in the stairwell on the ground floor and on the steps had been fired from another.

{¶7}     Several weeks after the shootings, Kennedy told Derrell Anderson about "Bedrock's" shooting, when they were both passengers in the car of man named Jaleel.  Anderson and Jaleel had picked up Kennedy from a parking lot in Walnut Hills and were taking him to Burnet Avenue in Avondale because Kennedy said he needed to escape from "guys" in the Walnut Hills neighborhood who were after him because he had killed Matthews.  Kennedy explained to Anderson the details of the crime, including that he had shot Matthews as she tried to shut the door on him, that he had taken the gambling money, that he had shot another man inside the apartment, and that "JayDee" had shot someone in the face on the stairs.

{¶8}     While in the Hamilton County Justice Center, Kennedy told two inmates, Tobias Johnson, who knew Matthews, and Jermaine Beard, about his role in the gambling-apartment shootings and provided the details of the crime.  Johnson testified that Kennedy had told him that Thompson had been gambling at Matthews's apartment, and that Thompson had set up the robbery, because he owed

3

Kennedy a favor for previously turning him onto a "lick." Kennedy said that Matthews had come to the door after he knocked on it, and that he had shot her when she tried to shut it. He also admitted that he had shot Turnbow because he tried to run, and that he had "robbed everybody." Kennedy credited his accomplice Thompson with shooting a man in the face on the stairs as they were leaving.

{¶9} Beard testified that Kennedy had told him that he had pretended to be "JayDee" to enter a gambling apartment, that he had shot the lady who opened the door when she tried to close it on him, and that he had shot a man named "Rodney" and had taken about $1500 from him.

### B. Vine-Street Shootings

{¶10} On June 23, 2006, Dwayne Stuckey was shot on Vine Street in the Over-the-Rhine area of Cincinnati. The shooting began in the street, but ended inside a Cricket Store, which was located next to a Kroger store. Stuckey was shot six times and eventually died from his wounds. Phillip Simmons, a bystander on the street, was injured by a stray bullet.

{¶11} Officer Shultz, on bike patrol nearby, heard the gunfire and rushed to the scene. He approached Stuckey and asked him who had shot him. After initially declining to answer, Stuckey identified his shooter as "Midnight" and "Midnight from Burnet."

{¶12} Limited video surveillance from the Cricket Store captured the image of the shooter, who appeared to be very dark complected. When questioned by the police about the crime, Kennedy, who was described as very dark complected, acknowledged that his nickname was "Midnight." He also admitted that Stuckey had previously robbed him. Kennedy was arrested in October 2006 on Burnet Avenue. While in the justice center, he told Major Paige that he had chased down and shot Stuckey on Vine Street. Paige also learned from Kennedy that a stray bullet had struck a bystander.

4

{¶13}     Kennedy also admitted to shooting Stuckey to another inmate, Dante Robb.  According to Robb, Kennedy explained that because Stuckey had robbed him a few days earlier, when he saw Stuckey leaving a Kroger store, he started after him and shot at him, striking both Stuckey and a bystander.  Both Robb and Paige testified at trial that they knew Kennedy as "Midnight."

## II. Procedure

{¶14}     The state originally indicted Kennedy for the Vine-Street shootings in 2007, but the prosecutor dismissed that indictment, apparently upon discovering a defect.  In July 2011, the prosecutor then joined the allegations from both shootings, resulting in a single, 15-count indictment for both incidents.

{¶15}     The gambling-apartment charges, Counts 1 through 9, included aggravated-felony-murder and murder counts with firearm specifications for the death of Janie Matthews, aggravated-felony-murder and murder counts with firearm specifications for the death of Rodney Turnbow, felonious-assault counts with firearm specifications for Deandre Thomas's injuries, an aggravated robbery count with firearm specifications for the theft of money from Matthews, Turnbow, and the other card players, including Dumas, and two counts of having weapons under a disability.

{¶16}     The Vine-Street-related charges, Counts 10 through 15, included purposeful-murder and felony-murder counts with firearm specifications for the death of Dwayne Stuckey, two felonious-assault counts with firearm specifications for Phillip Simons's injuries, and two counts of having weapons under a disability.

{¶17}     Prior to trial, Kennedy moved to sever the Vine-Street offenses from the gambling-apartment offenses.  The state opposed the motion, and the trial court overruled it.

{¶18} At that time, Kennedy also orally moved to exclude Officer Schultz from testifying to Stuckey's statement identifying his assailant as "Midnight" and "Midnight from Burnet." The trial court overruled the motion.

{¶19} During trial, Kennedy sought to discredit the state's evidence by arguing that Anderson, Johnson, Beard, Robb, and Paige were only seeking to receive favorable consideration from the state with respect to their own criminal cases. And in his defense, Kennedy presented testimony from several inmates who had been locked up in the justice center with him, and who denied that Kennedy had talked about his cases to anyone, including the state's witnesses.

{¶20} At the conclusion of the evidence, the jury found Kennedy guilty of all charges.

### III. Assignments of Error

### A. Misjoinder and Prejudicial Joiner

{¶21} In his first assignment of error, Kennedy argues that the trial court erred by overruling his motion to sever.

{¶22} Kennedy moved to sever the offenses related to the Vine-Street shootings from the offenses related to the gambling-apartment shootings. He claimed that Crim.R. 8(A) did not allow the joiner of those offenses in the same indictment, and that, if proper, the joinder would be prejudicial as contemplated by Crim.R. 14. He argued that the failure to sever would be prejudicial because the jury was likely to rely on evidence related to the offenses in one incident to infer Kennedy's guilt for the offenses related to the other incident. The state argued that joiner of the "homicides" was appropriate, and that severance was not appropriate, because Kennedy had failed to show prejudice from the joinder. The trial court overruled the motion.

{¶23} Crim.R. 8(A) pertains to the joinder of offenses in a single indictment. This rule provides that "two or more offenses may be charged in the

6

same indictment" if the offenses are (1) "of the same or similar character; (2) "based on the same act or transaction;" (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan," or (4) "part of a course of criminal conduct." Crim.R. 8(A). Like R.C. 2941.04, Crim.R. 8 attempts to set the limits of permissible joinder.

{¶24} Where joinder is not appropriate under Crim.R. 8(A) because the offenses do not meet at least one of the four joinder requirements, the trial court should grant a motion to sever, even in the absence of prejudice. *See State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992) (holding that "if similar offenses are properly joined pursuant to Crim.R. 8(A), a defendant can still move to sever the charges pursuant to Crim.R. 14 if their consolidation will prejudice his or her rights"); *see also State v. Atkinson*, 4 Ohio St.2d 19, 21-22, 211 N.E.2d 665 (1965) (applying R.C. 2941.04), *limited in part on other grounds*, *State v. Minneker*, 27 Ohio St.2d 155, 271 N.E.2d 821 (1971). The issue involves a question of law, which we review de novo. *See Schaim* at 59-63.

{¶25} Kennedy maintains that the Vine-Street offenses were misjoined under Crim.R. 8 with the gambling-apartment offenses. The state does not address the requirements of Crim.R. 8. Nonetheless, after our review of the record, we find that joinder of the offenses was permitted under Crim.R. 8(A), even though the offenses were not based on the same transaction or related transactions.

{¶26} The Ohio Supreme Court has repeatedly held that the joinder of multiple offenses against the same defendant in a single trial is encouraged. *State v. Williams*, 73 Ohio St.3d 153, 158, 652 N.E.2d 721 (1995); *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). Under Crim.R. 8(A), offenses that are "of the same or similar character" may be joined. *See State v. Coleman*, 1st Dist. Hamilton No. C-900872, 1992 Ohio App. LEXIS 1046 (Mar. 11, 1992).

7

{¶27} The phrase "of the same or similar character" has been given a broad definition. *See Schaim*, 65 Ohio St.3d at fn. 6, 600 N.E.2d 661 (rejecting defendant's request for a narrow definition in a case involving charges of forcible rape, sexual imposition, and gross sexual imposition against three different victims.)

{¶28} Kennedy claims that the incidents were not of the same or of a similar character. But both incidents resulted in charges alleging that Kennedy had purposely caused the death of another (Counts 1, 3, and 10), that he had caused the death of another while committing felonious assault (Counts 2, 4, and 11), that he had knowingly caused serious physical harm and had knowingly caused physical harm by means of a firearm (Counts 5, 6, 12, and 13), and that he had had weapons under a disability (Counts 8, 9, 14, and 15). And both sets of charges contained the same firearm specifications.

{¶29} Although the two incidents did not involve the exact same offenses—the gambling-apartment shootings also involved a robbery, which affected several of the counts—the offenses stemming from the two incidents were of a similar character, involving acts of violence committed with a firearm. Accordingly, we hold that in this case the similarities justified joinder in the first instance under Crim.R. 8(A).

{¶30} The joining of offenses because they are of a same or similar character, however, creates a greater risk of prejudice to a defendant. *Schaim*, 65 Ohio St.3d at 58, 600 N.E.2d 661. Joinder may not be appropriate, even though the offenses are of the same or similar character, "when the offenses are unrelated and the evidence as to each is very weak." *Torres*, 66 Ohio St.2d at 343, 421 N.E2d 1288. *See Schaim* at 62; *State v. Echols*, 128 Ohio App.3d 677, 696, 716 N.E.2d 728 (1st Dist.1998) (holding that the trial court erred by failing to sever counts where the evidence of the offenses failed to demonstrate a modus operandi, and where the

likelihood that the jury would misuse the evidence was substantial); *State v. Garrett*, 12th Dist. Clermont No. CA2008-08-075, 2009-Ohio-5442.

{¶31} Crim.R.14 provides relief from prejudicial joinder. A defendant requesting separate trials of multiple charges must affirmatively demonstrate prejudice by providing the trial court with adequate information so that the trial court can "weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres*, 66 Ohio St.2d at syllabus, 421 N.E.2d 1288.

{¶32} The state may rebut the defendant's claim of prejudice in two ways. The state may argue that it could introduce evidence relevant to one offense in the trial of the other offense as other-acts evidence. Or the state may show that the evidence relevant to each offense joined is "simple and direct." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶33} We review the trial court's determination of prejudice and its denial of separate trials under an abuse of discretion standard. *See Torres*, 66 Ohio St.2d at syllabus, 421 N.E.2d 1288.

{¶34} Kennedy claims prejudice arose from the joinder because the evidence of the multiple murders and assaults, when presented in a single trial, created an accumulation of evidence that allowed the state to portray him as a gun-toting, violent individual, and that allowed the jury to infer his guilt for the offenses on this improper portrayal, despite the state's presentation of weak evidence.

{¶35} To negate Kennedy's claim of prejudice, the state contends that the evidence of each shooting was simple and direct, and that the jury could easily segregate the proof relevant to each. We agree. The jury could easily segregate the evidence from each incident. The facts of each were uncomplicated and distinguishable, and the state referred to the evidence in support of each shooting in that manner. And the evidence was amply sufficient to sustain the verdicts related to each incident, whether or not the counts were tried together.

9

{¶36}     Under these circumstances, Kennedy has failed to demonstrate error in the trial court's denial of his motion to sever the gambling-apartment offenses from the Vine-Street offenses.  Accordingly, we overrule the first assignment of error.

### B. Dying Declaration

{¶37}     In his second assignment of error, Kennedy contends that the trial court erred by allowing Officer Schultz to testify as to what Stuckey said about who had shot him, in violation of the rules of evidence and in violation of his right, secured by the Sixth Amendment to the United States Constitution, to confront witnesses against him.

{¶38}     Before we begin our analysis, we note that our record does not contain Kennedy's written motion for the exclusion of the evidence or the transcript from the evidentiary hearing on that matter.  Kennedy orally moved pretrial for the exclusion of Stuckey's statements, claiming that they were inadmissible under Evid.R. 804(B)(2), and that their admission would violate his right of confrontation. He mentioned at that time that he had filed a written motion, but he was apparently relying on the written motion in limine filed in the dismissed case, which the trial court had overruled after an evidentiary hearing upon a determination that the statements were dying declarations.  The trial court in this case overruled the oral motion without holding a new evidentiary hearing, based on the parties' summary of the evidence at the prior hearing and their arguments.  At that time, the state argued that the court had correctly determined that Stuckey's statements to Officer Schultz were "dying declarations," and that they thus fell under an exception to the hearsay rule. Kennedy did not object to Officer Schultz's testimony at trial.

{¶39}     We address Kennedy's claim without deciding whether, under these circumstances, Kennedy waived all but plain error.  And we review the assignment of error based on the record before us, which does not contain Kennedy's written motion in limine or the transcript of the evidentiary hearing in the dismissed case.

### 1. Evid.R. 804(B)(2)

{¶40}   Evid.R. 804(B)(2) sets forth the hearsay exception for "dying declarations."   The rule provides that "a statement made by a declarant, while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death," is not excluded by the hearsay rule in a prosecution for homicide or in a civil case, if the declarant is unavailable as a witness.

{¶41}   To fall under the hearsay exception set forth in Evid.R. 804(B)(2) for dying declarations, the evidence must show that the deceased's statements were made under a sense of impending death that excluded from the mind of the dying person all hope or expectation of recovery.  *See, e.g., State v. Ray*, 189 Ohio App.3d 292, 2010-Ohio-2348, 938 N.E.2d 378, ¶ 40 (8th Dist.); *State v. Washington,* 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 21; *State v. Ross*, 7th Dist. Nos. 96-CA-247 and  96-CA-251, 1999 Ohio App. LEXIS 4859 (Oct. 12, 1999), cited in *State v. McGee*, Mahoning Case No. 07-MA-137, 2009-Ohio-6397, ¶ 33.

{¶42}   The declarant is not required to state that he believes that he will not survive; rather, the necessary state of mind can be inferred from circumstances at the time of the declaration.  *Ross, supra*, citing *State v. Kotowicz,* 55 Ohio App. 497, 501, 9 N.E.2d 1003 (6th Dist.1937), quoting *Shepard v. United States,* 290 U.S. 96, 100, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

{¶43}   According to Kennedy, the evidence at trial failed to demonstrate that Stuckey was under a sense of impending death when he made the statements identifying his shooter as "Midnight" and "Midnight from Burnet."   The state maintains that the statements were properly admitted under Evid.R. 804(B)(2) as dying declarations.  We agree with the state.

{¶44}   When Officer Schultz responded to the scene of the Vine-Street shooting, a bloodied Stuckey was laying on the floor of the Cricket Store.  Stuckey

was conscious, but he was moaning and gasping in pain from receiving six gunshot wounds, including wounds to his left hip, right buttocks, right arm, right calf, left thigh, and torso. This last wound was caused when a bullet entered his back and perforated his lung before exiting out of his chest.

{¶45} At first, Stuckey declined to tell the officer who had shot him. Officer Schultz pressed Stuckey for a statement as he watched Stuckey's physical condition deteriorate and his coloring fade.

{¶46} Officer Schultz asked, "You sure you don't want to tell me? You are laying on the floor, you have hole in your chest and you are turning gray. Maybe you will live and take care of this yourself, but if you are going to die, you can give me the information, tell me who shot you, where the gun is, where he is at." Responding, Stuckey shrugged his shoulders and then said, "Midnight." When Officer Schultz asked, "Who is Midnight?," Stuckey replied, "Midnight from Burnet."

{¶47} Stuckey became unconscious shortly afterwards, and paramedics transported him to the hospital, where he later died from "hemorrhagic shock due to hemothorax due to gunshot wound of torso."[1]

{¶48} Based on the circumstances at the time of the statements, we conclude that Stuckey believed his death was imminent. Stuckey had suffered multiple gunshot wounds, and he was visibly struggling with his vital functions. Moreover, Officer Schultz essentially told Stuckey that he was going to die, and that if Stuckey believed so, then he needed to identify his assailant. Stuckey identified his assailant, demonstrating his belief of impending death.

{¶49} Kennedy also suggests that Stuckey's statements did not qualify as dying declarations because Stuckey did not pass away immediately. Traditionally, the

---

[1] The state presented the coroner's testimony by a videotaped deposition. Although that testimony was played to the jury, it was not transcribed by the court reporter or filed with the court under the case numbered B-1104558. But the coroner's report on the cause of death was admitted as an exhibit at trial and is a part of our record.

length of time elapsing between the declaration and death is an element to be considered in whether the statement was made under impending belief of death. *Mattox v. United States*, 146 U.S. 140, 151, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Ray*, 189 Ohio App.3d 292, 2010-Ohio-2348, 938 N.E.2d 378, ¶ at 42. But " 'it is the impression of almost immediate dissolution, and not the rapid succession of death, in point in fact, that renders the testimony admissible.' " *Mattox* at 151, quoting 1 Greenleaf, *Evidence* 15th Ed. Section 156, 157, 158. "Despair may even be gathered, though the period of survival outruns expectations." *Sheppard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

{¶50} While Kennedy suggests that Stuckey lived for 36 hours, the medical records unequivocally demonstrate that Stuckey died about 12 hours later. Further, Officer Schultz's testimony shows that Stuckey made his declarations only after determining that he would soon die and would not be able to avenge his killer, a reasonable conclusion under the circumstances, where he had been shot six times and was struggling to live. Stuckey became unconscious shortly after making the statements and died in surgery. Under these facts, we conclude that Stuckey made the declarations under a belief of impending death, even though he died 12 hours later.

{¶51} Because Stuckey's statements to Officer Schultz identifying his assailant were made under a belief of impending death and were offered in a prosecution for homicide, the statements qualified as dying declarations under Evid.R. 804(B)(2).

{¶52} This case is distinguishable from *State v. Woods*, 47 Ohio App.2d 144, 352 N.E.2d 598 (9th Dist.1972), on which Kennedy relies. In *Woods*, the court held that the record did not support a finding that the victim had sensed his death was impending, and that he had abandoned all hope of recovery, even though the victim had suffered a mortal gunshot wound and was in critical condition at the time

13

of his declaration. Unlike the victim in *Woods*, Stuckey was moaning and gasping in pain and had resisted providing the information about his assailant until he was informed of the severity of his condition. Further, Officer Schultz believed that Stuckey thought he was dying, unlike in *Woods*, where the emergency room surgeon testified that he did not believe that the victim had believed that he would die and that the victim had only complained about leg pain. *Id.* at 146-147. In light of these differences, we are not persuaded that *Woods* requires a different result.

### 2. Confrontation-Clause Analysis

{¶53} Kennedy additionally argues that the admission of Stuckey's statement to Officer Schultz violated his rights under the Confrontation Clause of the Sixth Amendment. The Confrontation Clause prohibits the admission of testimonial statements of a witness who did not testify at trial, unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

{¶54} In *Crawford*, the Supreme Court substantially altered prior case law that had generally permitted the admission of statements that fell within hearsay exceptions based upon unavailability, provided that the statements bore significant indicia of reliability. The *Crawford* court rejected that prior case law as insufficient to protect the right to confrontation set forth in the Sixth Amendment's Confrontation Clause, which incorporated the right of confrontation as it existed "at common law, admitting only those exceptions established at the time of the founding." *Crawford* at 54.

{¶55} The *Crawford* court observed, however, that dying declarations were recognized at the common law as an exception to the right of confrontation. *Id.* at fn. 6.

14

{¶56} After the Supreme Court's decision in *Crawford*, this court, in *State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, sua sponte reviewed whether statements admitted as dying declarations under the hearsay exception set forth in Evid.R. 804(B)(2), an exception based on the unavailability of the witness, violated the Confrontation Clause and created either preserved or plain error in that case. We stated that *Crawford* did not appear to bar the admission of the challenged statements because they were not testimonial, and the Confrontation Clause is inapplicable to, and does not prohibit the use of, nontestimonial statements. *Id.* at ¶ 75. We also noted that the *Crawford* court had recognized the common-law hearsay exception for dying declarations and had "left unanswered the question whether its analysis applies to testimonial dying declarations." *Id.*

{¶57} We cited *Nix* with approval in *State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 33, when rejecting the defendant's claim that the admission of the victim's statements violated his Confrontation Clause rights. We held that the statements, which were admissible under the Evid.R. 804(B)(2) exception for dying declarations, were not testimonial, and that their admission did not violate the Confrontation Clause. *See also State v. Duncan*, 8th Dist Cuyahoga No. 87220, 2006-Ohio-5009, ¶ 24.

{¶58} In this case, neither party has analyzed whether Stuckey's statements were "testimonial" under the relevant precedent, and we refrain from making that determination. Instead, we hold that the admission of a statement that qualified as a dying declaration under the common law, including one that is testimonial, does not conflict with the Sixth Amendment and does not implicate *Crawford*. Further, we hold Stuckey's statements to Officer Schultz qualified as dying declarations under the common law. Thus, the admission of the statements did not violate Kennedy's Confrontation Clause rights, and a determination of whether the statements are testimonial is unnecessary.

{¶59} The Ohio Supreme Court has not addressed whether *Crawford* altered the analysis concerning the admission of dying declarations when challenged as a Confrontation Clause violation. But the court recognized long before *Crawford*, and long before the promulgation of Ohio Evid.R. 804(B)(2), that dying declarations had been recognized at common law as an exception to the constitutional right of confrontation. *See State v. Kindle*, 47 Ohio St. 358, 361, 24 N.E. 485 (1890); *Summons v. State*, 5 Ohio St. 325, 342 (1856).

{¶60} And several other state supreme courts have expressly held that *Crawford* does not apply to the admission of a statement recognized as a dying declaration under the common law, even if it is testimonial. *See, e.g., People v. Monterroso*, 34 Cal.4th 743, 764, 22 Cal. Rptr.3d 1, 101 P.3d 956 (2004); *Commonwealth v. Nesbitt*, 452 Mass. 236, 249, 892 N.E.2d 299 (2008) ("The Confrontation Clause 'is most naturally read as a reference to the right of confrontation at common law,' " which recognized dying declarations as an exception to the right of confrontation); *State v. Jones*, 287 Kan. 559, 569, 197 P.3d 815 (2008) ("[W]e are confident that, when given the opportunity to do so, the Supreme Court would confirm that a dying declaration may be admitted into evidence, even when it is testimonial and unconfronted."); *Harkins v. State*, 122 Nev. 974, 982, 143 P.3d 706 (2006) ("[B]ecause dying declarations were recognized at common law as an exception to the right of confrontation, they should continue to be recognized as an exception.").

{¶61} The California Supreme Court, in *Monterroso*, reasoned as follows:

> Dying declarations were admissible at common law in felony cases, even when the defendant was not present at the time the statement was taken. (Peake, *Evidence* [3d ed. 1808] p. 64). In particular, the common law allowed " 'the declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed,' " provided that " 'the deceased at the time of making such declarations was conscious of his danger.' " (*King v. Reason* [K.B. 1722] 16 How. Str. Tr. 1,

16

24-25.) To exclude such evidence as violative of the right to confrontation "would not only be contrary to all precedents in England and here, acquiesced in long since the adoption of these constitutional provisions, but it would be abhorrent to the sense of justice and regard for individual security and public safety which its exclusion in some cases would inevitably set at naught. But dying declarations, made under certain circumstances, were admissible at common law, and that common law was not repudiated by our constitution in the clause referred to, but adopted and cherished." (*State v. Houser* [Mo. 1858] 26 Mo. 434, 438; *accord, Mattox v. United States* (1895), 156 U.S. 237, 243-244, 39 L.Ed. 409, 15 S.Ct. 337, (from time immemorial they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility".)

Monterroso at 764-765.

{¶62} The *Monterroso* court then concluded:

Thus, if, as *Crawford* teaches, the confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding" (*Crawford, supra*, 124 S.Ct. at 1365, citing *Houser, supra*, 26 Mo. at 433-435), it follows that the common law pedigree of the exception for dying declarations poses no conflict with the Sixth Amendment.

*Id.* at 765.

{¶63} More recently, the United States Supreme Court has reiterated *Crawford's* acknowledgement of authority that the Sixth Amendment incorporates an exception for testimonial dying declarations. *See Giles v. California*, 554 U.S. 353, 358-359, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) ("We have previously acknowledged that two forms of testimonial statements were admitted at the common law even though they were unconfronted[;] [t]he first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying."); *Michigan v. Bryant*, ____ U.S. ____, 131 S.Ct. 1143, 1151, 179 L.Ed.2d 93 (2011), fn. 1, ("[I]n Crawford * * * we first suggested that dying declarations, even

17

if testimonial, might be admissible as a historic exception to the Confrontation Clause.").

{¶64} In light of this case law, we hold that the Sixth Amendment incorporates an exception for "the common law pedigree" of dying declarations, even testimonial ones, and that *Crawford* did not alter this rule. *See Monterreso*, 34 Cal.4th at 765, 22 Cal. Rptr.3d 1, 101 P.3d 956.

{¶65} Next, we determine whether Stuckey's statements met the constitutional standard for dying declarations, notwithstanding that we have already held that his statements qualified as dying declarations under Evid.R. 804(B)(2). *See generally*, Nicolas, *'I'm Dying to Tell You What Happened': The Admissibility of Testimonial Dying Declarations Post-Crawford*, 37 Hastings Const.L.Q. 487 (Spring 2010) (examining how to define the phrase "dying declarations" as a constitutional matter.).

{¶66} This court did not examine this issue in *Nix* or *Washington*, and Kennedy has not presented any argument that the Evid.R. 804(B)(2) exception for a dying declaration deviates from the common-law exception recognized when the United States Constitution was drafted.

{¶67} Evid.R. 102 expressly requires an Ohio court to apply the "principles of the common law of Ohio" unless the evidence rule "clearly indicates that a change is intended." Although we note that Evid.R. 804(B)(2) expands the common-law rule by allowing the exception for dying declarations in civil cases, *see* Staff Note to Rule 804(B)(2), the rule appears otherwise to comport with the common law definition of "dying declarations" at the time of the federal Constitution.

{¶68} In *Robbins v. State*, 8 Ohio St. 131, 163 (1857), the Ohio Supreme court recognized as settled law that in a prosecution for homicide, a deceased-declarant's statement about the cause or circumstances of his or her death passed

muster as a dying declaration under Ohio's Confrontation Clause only if the court was satisfied that the statement had been "made under a sense of *impending death*, excluding from the mind of the dying person *all hope or expectation of recovery.*" (Emphasis in original). *See Montgomery v. State*, 11 Ohio 424, 425 (1842) (holding that the court must determine "that the deceased not only made the declarations just before death, and while in extremis, but also that he was conscious of his true condition").

{¶69} Ohio's "confrontation clause," provides that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face." Article I, Section 10, Ohio Constitution. This right is understood to encompass the right of confrontation as recognized by the Sixth Amendment to the United States Constitution. *See Summons*, 5 Ohio St. at 340. In *Summons*, the Ohio Supreme Court described Ohio's confrontation clause as "a constitutional guaranty of one of the great fundamental principles well established, and long recognized at common law, both in England and this country." *Id.* The court then confirmed that "the assertion of it in the fundamental law of the State, was designed neither to enlarge nor curtail it in its operation, but to give it permanency, and secure it against the power of change or innovation." *Id.*

{¶70} We have already held that Stuckey's statement was made under an impending sense of death, without any hope of recovery. Thus, we conclude that Stuckey's statements, offered in Kennedy's prosecution for homicide and identifying Kennedy as his assailant, qualified as dying declarations under the common law. *See Robbins*, 8 Ohio St. at 163. Therefore, we hold that the admission of these statements did not conflict with Kennedy's Sixth Amendment right to confrontation.

{¶71} Accordingly, we overrule the second assignment of error.

## C. Other-Acts Evidence

{¶72}     In his third assignment of error, Kennedy contends that the trial court's admission of other-acts testimony, in violation of Evid.R. 404(B), denied him a fair trial.

{¶73}     Specifically, Kennedy challenges the testimony of jail-inmate Tobias Johnson, who testified about conversations he had had with Kennedy while incarcerated with him at the justice center.  After Johnson related how Kennedy had described the Matthews-Turnbow shooting, the prosecutor then asked, "[Was] there ever a time when you observed the defendant either talking to you or other people about other killings that he had been involved in?"  Defense counsel objected on the grounds that the question was eliciting other-acts testimony.  Anticipating Johnson's response, the prosecutor stated that the testimony would demonstrate Kennedy's intent to kill Matthews, Turnbow, and Stuckey.   The trial court overruled the objection.  Johnson then testified that Kennedy would get keyed up by bragging that he was a serial killer and "got bodies on his belt."

{¶74}     Evid.R. 404(B) precludes the admission of evidence of other crimes offered to prove the character of an accused in order to show that the accused acted in conformity with that character.  But the rule does not preclude the admission of that evidence for other purposes.  *See* Evid.R. 404(B); s*ee also* R.C. 2945.59.

{¶75}     In evaluating the admissibility of other-acts evidence, the trial court should first "consider whether the other act evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20, citing Evid.R. 401.  Next, the court should determine if "evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other act evidence is presented for a legitimate purpose, such as those stated in Evid.R.

404(B)." *Id.* Finally, the court should "consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.*, citing Evid.R. 403.

{¶76} The admission of other-acts evidence under Evid.R. 404(B) rests within the broad discretion of the trial court. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, syllabus; *Williams* at ¶ 17. We review the trial court's decision under an abuse-of-discretion standard. *Morris, supra*.

{¶77} " 'Abuse of discretion' has been described as including a ruling that lacks a " 'sound reasoning process.' " *Morris* at ¶ 14, citing *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Our review is a deferential one; it is not enough for this court to determine that the trial court abused its discretion simply because we may have reached a different conclusion. *Id.* Further, we should not disturb an evidentiary decision "in the absence of an abuse of discretion that created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

{¶78} In this case, the challenged testimony passes the first step of the three-step analysis. Kennedy was charged with purposefully causing the death of Matthews, Turnbow, and Stuckey. Thus, the state was charged with proving that Kennedy had intended to kill all three, and that the deaths were not, as Kennedy argues in the case of Matthews and Turnbow, the result of recklessness. That Kennedy bragged about being a killer tended to show that he had intended to kill them.

{¶79} The testimony also passes the second step of the analysis. Contrary to Kennedy's assertion, the state used the testimony for the specific purpose of showing that Kennedy, who bragged about the killings, had intended to kill his victims. In closing argument, the prosecutor told the jury that Kennedy's objection to

21

Johnson's anticipated testimony was overruled because the testimony was admissible to prove what Kennedy "was thinking about" when he shot his victims.

{¶80}  The final step we consider is whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice. Kennedy was charged with three counts of purposeful murder, and the state had evidence to support those charges.  The fact that Kennedy bragged about being a serial killer after the three murders was probative of his intent to kill his shooting victims.  There was no danger of unfair prejudice in this case because the prosecutor told the jurors the specific purpose for which they could use the evidence.  Further, the defense argued that Kennedy's bragging was only "puffing," a necessary part of survival in the "murder pod."

{¶81}  Under these circumstances, we conclude that the trial court did not abuse its discretion by allowing the challenged other-acts testimony.  Accordingly, we overrule the third assignment of error.

### D. Sufficiency-and Weight-of-the-Evidence Claims

{¶82}  In his fourth assignment of error, Kennedy challenges the sufficiency of the evidence to support his convictions, as well as the weight given it by the jury.

{¶83}  The test for the sufficiency of the evidence required to sustain a conviction is whether, after viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as

both are functions reserved for the trier of fact. *See State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, 968 N.E.2d 27, ¶ 25 (1st Dist.).

{¶84} When reviewing a weight-of-the-evidence question, an appellate court must review the entire record, weight the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

### 1. Gambling-Apartment Shootings—Counts 1, 3, 5, 7, and 8

{¶85} With respect to the gambling-apartment shootings, Kennedy was convicted of aggravated murder for purposely causing the death of Matthews, in violation of R.C. 2903.01(B), with a three-year firearm specification (Count 1), aggravated murder for purposely the death of Turnbow in violation of R.C. 2903.01(B) (Count 3), felonious assault for knowingly causing physical harm to Thomas in violation of R.C. 2903.11(A)(1) (Count 5), aggravated robbery for the theft of money facilitated by the use of a deadly weapon with respect to Dumas and the other occupants, in violation of R.C. 2911.01(A)(1) (Count 7), and having weapons under a disability in violation of R.C. 2923.13(A)(2) (Count 8). The state proceeded against Kennedy as an accomplice with respect to the felonious assault of Thomas.

{¶86} The evidence at trial met the test of sufficiency. Dumas testified that he, Matthews, Turnbow, and the others present at Matthews's apartment were robbed at gun point during a card game that Thompson had previously participated in. Beard testified that Kennedy had told him that Jaydee Thompson had turned him "onto a lick at a gambling apartment," and that he had shot the woman who had answered the door and a man named "Rodney" (Turnbow), and then took $1500 out of Rodney's pocket.

{¶87} Tobias Johnson, another witness for the state, testified that Kennedy had admitted to committing these offenses, including shooting Matthews and Turnbow, after going to Matthews's home to commit a robbery. According to Johnson, Kennedy also told him that Thompson had shot Thomas in the face on the staircase as they fled. Derrell Anderson provided testimony concerning similar admissions by Kennedy. Thomas, who knew Thompson, testified that he had recognized Thompson as his shooter.

{¶88} Finally, Kennedy stipulated to having the prior convictions that created the disability in support of the weapons offense that resulted from the gambling-apartment shootings.

{¶89} In addition to his general challenge to the sufficiency of the evidence, Kennedy specifically argues that the state failed prove that he had purposely caused the deaths of Matthews and Turnbow. We disagree.

{¶90} Kennedy was convicted of aggravated felony murder under R.C. 2903.01(B), which proscribes "purposely caus[ing] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery." A person acts purposely when he specifically intends to cause a certain result. *See* R.C. 2901.22(A); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 188. Intent to kill may be proved by inference and "may be inferred in a[n] [aggravated] felony-murder when the offense and the manner of its commission would be likely to produce death." *State v. Gardner*, 74 Ohio St.3d 49, 60, 656 N.E.2d 623 (1995); *see State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 28, citing *State v. McCoy*, 1st Dist. Hamilton No. C-090559, 2010-Ohio-5810, ¶ 36.

{¶91} Kennedy claims that the evidence was insufficient to demonstrate a purpose to kill Matthews because there was some evidence that she had been shot through the door as she was opening it, instead of closing it. But whether Kennedy

24

shot Matthews when she was closing or opening the door is irrelevant. Either way, he had to know that someone was responsible for the movement of the door, and that that person was standing on the other side of it, blocking his entrance. And Kennedy's bullet, fired at fairly close range, struck Matthews squarely in her chest.

{¶92} Kennedy also suggests that Turnbow's death was not a purposeful killing, just the result of an errant bullet. But Kennedy shot Turnbow in the head, at what had to have been fairly close range in Matthews's small apartment, and there was evidence that Kennedy had shot Turnbow because he tried to run.

{¶93} Further, Johnson testified that Kennedy had bragged while incarcerated about being a killer. This evidence, along with the evidence of the manner of the shootings, when viewed in the light most favorable to the prosecution, was sufficient evidence from which the trier of fact could have reasonably concluded that Kennedy had specifically intended to cause death. *See Tibbs*, 2011-Ohio-6716 at ¶ 37.

{¶94} In sum, construing the evidence in the light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that Kennedy had committed the offenses related to the gambling-apartment shootings, including the aggravated felony murders of Matthews and Turnbow, the felonious assault of Thomas, the aggravated robbery of Dumas and the other gambling participants in Matthews's apartment, and the offense of having weapons under a disability.

### 2. Vine-Street Shootings—Counts 10, 12, and 14

{¶95} With respect the Vine-Street shootings, Kennedy was convicted of murder in violation of R.C. 2903.02(A), with a three-year firearm specification, for purposely causing the death of Stuckey (Count 10), felonious assault in violation of R.C. 2901.11(A)(1), for knowingly causing serious physical harm to Simmons (Count

12), and having weapons under a disability in violation of R.C. 2913.13(A)(2) (Count 14).

{¶96} Officer Schultz testified that had he arrived at the scene of the shooting on Vine Street shortly after hearing shots fired. He learned that a bystander, Simmons, had been shot on the street, and he found Stuckey on the floor of a Cricket Store with multiple bullet wounds. Stuckey identified his shooter first as "Midnight" and then as "Midnight from Burnet." Several witnesses at trial testified that Kennedy was known as "Midnight," and that he "hung out" on Burnet Avenue. Kennedy even acknowledged his nickname during a police interview, and he admitted that he knew Stuckey, and that Stuckey had previously robbed him.

{¶97} Robb and Paige, two inmates who had been incarcerated with Kennedy at the justice center, testified that Kennedy had admitted to shooting Stuckey and a bystander on that day.

{¶98} Kennedy specifically argues that the state failed to prove that he caused "serious physical harm," an element of the felonious-assault charge under R.C. 2903.11(A)(1) relating to Simmons. In support, Kennedy cites testimony from Officer Thompson, assigned to investigate the Vine-Street shootings, who stated that Simmons was "shot superficially with a stray bullet."

{¶99} The "serious physical harm" element of R.C. 2903.11(A)(1) is defined in R.C. 2901.01(A)(5). This definition includes "any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d). Although Simmons did not testify and Officer Thompson generally characterized Simmons's injury as superficial, the medical records admitted at trial by stipulation demonstrated that Simmons had sustained multiple "abrasion/puncture wounds" caused by bullet fragments, with some fragments remaining in his soft tissue. At the hospital, the wounds were irrigated and treated with antibiotics. Simmons was prescribed vicodin for severe

26

pain and antibiotics, upon discharge after spending the night at the hospital. This evidence, when viewed in the light most favorable to the prosecutor, was sufficient to convince a rational trier of fact beyond a reasonable doubt that Kennedy had caused "serious physical harm" to Simmons.

{¶100} Finally, Kennedy stipulated to his prior convictions that had resulted in a disability on the day of the Vine-Street shootings. The stipulation supported his conviction for having weapons under a disability on that date.

{¶101} We conclude, therefore, after construing the evidence in the light most favorable to the prosecution, that any rational juror could have concluded beyond a reasonable doubt that Kennedy had committed all of the offenses related to the Vine-Street shootings, including the murder of Stuckey, the felonious assault of Simmons, and the offense of having weapons under a disability.

### 3. Weight-of-the-Evidence Claim

{¶102} Consistent with his defense at trial, Kennedy attacks the credibility of the state's witnesses, many of whom were convicted felons hoping to gain favorable consideration in exchange for their testimony. But the jurors were certainly aware of the potential to fabricate under these circumstances, and they were able to view the witnesses' credibility and any inconsistencies in their testimony. We note that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Further, the testimony from the other witnesses and the physical evidence in the case offered corroboration for the testimony of these "cooperating" witnesses.

{¶103} In sum, we hold that state presented substantial, credible evidence to support the convictions. Further, we hold that there is no basis to conclude that the trier of fact lost its way or committed a manifest miscarriage of justice in resolving

the factual issues against Kennedy. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶104} Accordingly, we overrule the fourth assignment of error.

### E. Sentencing

{¶105} In his final assignment of error, Kennedy raises several sentencing issues. Before addressing those issues, we note that the trial court merged several of the offenses and actually convicted Kennedy on only eight counts, even though the jury found Kennedy guilty of all 15 counts charged in the indictment.

{¶106} With respect to the gambling-apartment shootings, the trial court imposed the following sentences: Count 1, a life sentence without the possibility of parole, with a three-year term for the firearm specification, to be served prior to and consecutive to the life sentence; Count 3, a life sentence without the possibility of parole; Count 5, eight years of incarceration; Count 7, ten years of incarceration; and Count 8, three years of incarceration. With respect to the Vine-Street shootings, the trial court imposed sentence as follows: Count 10, 15 years to life with a three-year term from the firearm specification, to be served prior to and consecutive to, the 15 years to life; Count 12, eight years of incarceration; and Count 14, three years of incarceration. The court ordered that all the sentences be served consecutively.

### 1. R.C. 2941.25

{¶107} Kennedy first argues that his sentences are contrary to law because the trial court failed to afford him the protections of R.C. 2941.25, Ohio's multiple-count statute. This statute mandates a sentence on only one of multiple offenses if the offenses are allied offense of similar import committed neither separately nor with a separate animus as to each.

{¶108} We review the trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1.

{**¶109**}   Specifically, Kennedy argues that his convictions for the aggravated murders of Matthew and Turnbow, the felonious assault of Thomas, and the aggravated robbery at the gambling apartment were allied offense of similar import subject to merger, committed in the same course of conduct and with the same animus—to rob the individuals in Matthews's apartment.   Kennedy relies on *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, in which the Supreme Court held that "when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Id.* at syllabus.

{**¶110**}   The *Johnson* court abandoned its prior test for determining when two offenses are allied and subject to merger, which required the comparison of the elements in the abstract. *Id.*   After *Johnson*, the sentencing court must consider the statutory elements of each offense in the context of the defendant's conduct, and if the record shows that the state relied upon the same conduct to prove the two offenses and the offenses were committed neither separately nor with a separate animus as to each, then the defendant is afforded the protection of R.C. 2941.25, and the trial court errs in imposing separate sentences for the offenses.  *See, e.g.*, *Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-1195, at ¶ 41-42.

{**¶111**}   But *Johnson* does not require the merger of Kennedy's offenses under R.C. 2941.25.   The commission of the challenged offenses against separate victims results in a separate animus as to each.  *See State v. Wise*, 1st Dist. Hamilton No. C-790664, 1980 Ohio App. LEXIS 10212 (Oct. 15, 1980.)   Although the state proceeded against Kennedy for offenses arising from a single course of conduct, each offense involved a separate victim—the aggravated murder of Matthews, the aggravated murder of Turnbow, the robbery of Dumas, and the felonious assault of Thomas, which was not incidental to the robbery.

29

{¶112} For a similar reason, we reject Kennedy's argument that the murder of Stuckey and the felonious assault of Simmons, both arising out of the Vine-Street shootings, should merge.

{¶113} Accordingly, because R.C. 2941.25(B) authorized separate convictions, the trial court did not err by convicting Kennedy for the multiple offenses.

### 2. Findings for Consecutive Sentences

{¶114} Kennedy next contends that his aggregate sentence was contrary to law because the trial court failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences on the underlying offenses. Kennedy was sentenced in 2012, after the effective date of 2011 Am.Sub.H.B. 86 ("H.B. 86"), which revived the requirement, as set forth in R.C. 2929.14(C)(4), that trial courts make findings before imposing consecutive sentences. *See State v. Jones*, 1st Dist. Hamilton No. C-110603, 2012-Ohio-2075, ¶ 17. As this court has previously explained, the sentencing court's compliance with R.C. 2929.14(C)(4) involves a three-step process that flows from the statute. *See State v. Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 13, 15, and 16. Although the court is not required to use "talismanic words" to comply with the statutory-findings requirement, the trial court satisfies the requirements of R.C 2929.14(C)(4) when the record reflects that the court has engaged in the required analysis and has selected the appropriate statutory criteria. *Id.* at ¶ 16.

{¶115} Consecutive sentences imposed without the findings required by R.C. 2929.14(C)(4) are contrary to law and must be vacated. *State v. Cowins*, 1st Dist. Hamilton No. C-120191, 2013-Ohio-277, ¶ 36.

{¶116} In this case, the trial court ordered that Kennedy serve all of his prison terms for the underlying offenses consecutively. The state concedes, and we have confirmed, that the trial court failed to make the necessary findings to support

these consecutive sentences. Because the trial court ordered all of the sentences for the underlying offenses to served consecutively without making the necessary findings, those sentences were contrary to law. Accordingly, we must vacate those sentences. *Cowins* at ¶ 37.

### 3. R.C. 2929.11 and R.C. 2929.12

{¶117} Kennedy argues that the trial court failed to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the seriousness and recidivism factors set forth in R.C. 2929.12, and that we should review this alleged error under an abuse-of-discretion standard. We note that this court does not review sentences imposed after the effective date of H.B. 86 under an abuse-of-discretion standard. *See State v. White*, 1st Dist. Hamilton No. C-130114, 2013-Ohio-____ (Sept. 27, 2013), ¶ 9. Instead, we apply the standard set forth in R.C. 2953.08(G)(2), which requires a reviewing court to determine if a sentencing error renders the sentence contrary to law. *Id.* at ¶ 11.

{¶118} R.C. 2929.11 and 2929.12, unlike R.C. 2929.14(C)(4), are not fact-finding statutes. *See Alexander*, 1st Dist. Nos. C-110828 and C-110829, 2012-Ohio-3349 at ¶ 24. Although the trial court is required to consider the factors in these statutes when sentencing, we may presume that the court did in this case, because Kennedy has not affirmatively demonstrated otherwise. *Id.*

### 4. Postrelease Control

{¶119} We find merit to Kennedy's claim that the trial court failed to provide him with his postrelease-control warnings. The postrelease-control statutes require that, with respect to each offense, the sentencing court notify the offender, both at the sentencing hearing and in the judgment of conviction, of the length and mandatory or discretionary nature of postrelease control, of the consequences of violating postrelease control, and of the length of confinement that could be imposed

for a postrelease-control violation. *See* R.C. 2929.14(D), 2929.19(B)(2)(c) through (B)(2)(e), and 2967.28(B) and (C).

{¶120} In this case, although Kennedy was convicted of several "special felonies" for which postrelease control does not apply, the trial court was statutorily required to provide postrelease-control warnings as part of Kennedy's sentence for the other offenses. These include the first-, second-, and third-degree felony offenses. *See* R.C. 2929.19(B)(2)(c)-(e). The trial court's failure to comply with the statutory postrelease-control notification requirements after imposing prison terms for those other than the special-felony offenses renders that part of those sentences void. *See State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 26.

### 5. Earned-Credit Notification

{¶121} Kennedy also challenges the trial court's failure to inform him that he would *not* be eligible to earn credit toward his sentences while incarcerated. At the time of Kennedy's sentencing, R.C. 2929.14(D)(3) provided that "[i]f a court imposes a prison term * * * for a felony, it shall include in the sentence a statement notifying the offender that the offender may be eligible to earn days of credit under the circumstances specified in section 2967.193 of the Revised Code." *See* R.C. 2929.19(B)(2)(g). The days of credit vary from one day to five days. R.C. 2967.193(A). They may not be earned by a person sentenced to a prison term or term of life imprisonment for certain offenses, including aggravated murder and murder, or a person sentenced to life imprisonment without parole for aggravated murder. R.C. 2967.193(A).

{¶122} In this case, Kennedy was not eligible to earn days of credit while serving his sentences for aggravated murder and murder. On its face, R.C. 2929.14(D)(3) does not require a court to notify the defendant if, under the circumstances specified in R.C. 2967.193, he is not eligible to earn days of credit. For

this reason, we reject Kennedy's argument that the trial court erred by failing to inform him that he would *not* be eligible to earn credit towards his sentence while incarcerated for these ineligible offenses.

{¶123} In light of the above, the fifth assignment of error is sustained in part and overruled in part.

### IV. Conclusion

{¶124} We affirm the trial court's judgment with respect to the findings of guilt and the trial court's application of R.C 2941.25. But we must vacate Kennedy's sentences and remand for resentencing for the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C), and if so, to make the proper findings on the record. Further, the trial court must provide Kennedy with the appropriate postrelease-control notifications.

{¶125} Finally, it appears that the sentencing entry contains a typographical error with respect to counts 11, 13, 15, and the first gun specification to counts 10 and 12. The court's entry provides: "No sentences imposed on counts #11, #13, and #15 and gun specs to those charges and gun specifications #1 to counts #10 and #12, as they merge with the sentences imposed on counts #10, #13, and #15." The entry should have read, "No sentences imposed on counts #11, #13, and #15 and gun specs to those charges as they merge with the sentences imposed on counts #10, #12, and #14. No sentences imposed on gun specification #1 to counts #10 and #12 as they merge with gun spec #2." We ask the trial court to take note of this when resentencing Kennedy on remand.

Judgment accordingly.

**DINKELACKER** and **DEWINE, JJ.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.